Charles KYEES and Pauline Kyees, Plaintiffs-Appellants,

v.

COUNTY DEPARTMENT OF PUBLIC WELFARE OF TIPPECANOE COUNTY et al., Defendants-Appellees.

No. 76–1723.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1977.

Decided June 22, 1979.

Robert L. Justice, Logansport, Ind., for plaintiffs-appellants.

H. Hanly Hammel, Jr., Lafayette, Ind., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and FOREMAN, Chief District Judge.*

PER CURIAM.

On this appeal we are asked to decide whether foster parents and the foster children placed in their care during a substantial period have a constitutionally protected liberty interest in their relationship so that due process must be fulfilled before a state welfare agency removes the child from the foster home.

After argument of this appeal in this court, the Supreme Court discussed this question, but found resolution unnecessary in the case before the Supreme Court.

*Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). That case arose from New York, and the Court held the New York procedures adequate to protect whatever liberty interests the foster parents and children might have.

More recently, in a case arising from Georgia, the Fifth Circuit "concluded that there is no liberty interest here of full-fledged constitutional magnitude." *Drummond v. Fulton Cty. Dept. of Family, etc.*, 563 F.2d 1200 (5th Cir. 1977).

A majority of this panel has decided to follow the Fifth Circuit in *Drummond,* and therefore, we AFFIRM.

## I. THE PLACEMENT OF JOHN JOE BOWLING WITH CHARLES AND PAULINE KYEES AND HIS SUBSEQUENT REMOVAL

The undisputed facts appear as follows: John Joe Bowling, the child with whom we are concerned, was born out of wedlock on November 28, 1972. His father is unknown. His mother, due to mental and physical problems, is unable to care for him. Though his maternal grandmother tried to care for the infant for a time, on May 18, 1973, John Joe became a ward of Tippecanoe County, Indiana. Between May 18, 1973 and July 13, 1973, John Joe was placed with two foster families. He twice required hospitalization during this time though the record does not indicate any reason other than the child cried constantly. On July 13th, defendants placed John Joe with a childless couple, Charles and Pauline Kyees, duly licensed foster parents living in Lafayette, Indiana.

John Joe was the first foster child the Kyees had cared for. Although the contract between the Kyees and the defendants is not a part of the record, it is not disputed that it was a typical contract for foster care, providing only payment of a per diem allowance to the Kyees in exchange

---

* Chief District Judge James L. Foreman of the United States District Court for the Southern District of Illinois is sitting by designation.

for their temporary care of the child. It clearly did not create any expectation of a continuing relationship between the Kyees and John Joe. In addition, the record is clear that the Kyees were told, even before the natural mother had waived parental rights, that the placement would be temporary (probably less than a year) and that they would not be considered suitable as adoptive parents. While with the Kyees, the child improved considerably. At defendants' recommendation, the Kyees enrolled John Joe in a therapy program at Wabash Center for Physical Therapy. Five days a week, they took the child to the Center. In her February 14, 1974 psychological report on John Joe, Dr. Audrey Riker of the Wabash Center noted that the child's "cognitive abilities" were still somewhat below normal, but that he had developed a "strong and sound emotional attachment" to his foster parents. She suggested that "[u]nless a suitable adoptive placement can be found, it would be best to leave him where he is rather than disrupt this vital aspect of overall development." The Kyees were likewise developing an emotional attachment to the child and began to express an interest in adopting him. The agency discouraged this interest.

John Joe's natural mother signed "Voluntary Termination of Parental Rights" and "Consent to Adoption" forms on March 1, 1974. The following week the Kyees were informed of this and of defendants' active search for an adoptive home for the child. The Kyees had continued to express interest in adopting John Joe and the defendants again told them that they would not consent to such an adoption.

On April 10, 1974, the Kyees filed with the Tippecanoe Circuit Court a petition to waive the requirement of defendants' approval of their adoption of John Joe Bowling. In a letter to the court, defendants explained that they opposed the adoption because of the Kyees' age. Charles Kyees was 66 and Pauline Kyees 50 at the time of their application. Defendants were seeking parents "who will likely be alive through John's adolescent and teenage years; parents who are physically and emotionally able to cope with the growing up years." Defendants further explained that the Kyees had more information about the child's origins and early circumstances than would normally be given to adoptive parents. For this reason, defendants hoped for an out-of-county adoptive placement for the child. Finally, defendants' letter stated some concern about Mrs. Kyees' appreciation of the need for John Joe to continue his therapy at the Wabash Center.

The court denied the Kyees' petition on December 19, 1974. It found that the Kyees had done "an excellent job as foster parents, devoting much time and special attention to the child . . . ." It found them "faithful in keeping appointments at Wabash Center and cooperating with the Center's staff in its evaluation testing and training of the child." Thus, it found itself confronted with "a classic case of outstanding foster parents who have become emotionally involved with the child, seeking to adopt contrary to the views and against the wishes and policies of the Department." The court, however, considered itself unable to waive the requirements of defendants' approval of the Kyees' adoption in light of the Kyees' failure to prove that defendants' policy of denying consent to adoption by older couples was arbitrary or motivated by any consideration other than the best interests of the child. The Kyees did not appeal this decision.

Apparently, in April, 1974, at the time the Kyees made their petition to the Tippecanoe Circuit Court, defendants had arranged to move John Joe to a fourth foster home for a few days and to place him in an out-of-county adoptive home late in April. The record is unclear as to why this did not occur. In any case, John Joe remained with the Kyees until August, 1975, more than two years after the initial placement.

Having been unsuccessful in their attempt to adopt John Joe, the Kyees began to pursue alternative ways of maintaining the relationship they had established with the child. Specifically, in May, 1975 their attorney met with Defendants Wilms and

Abell to discuss the possibility of a local adoption that would allow the Kyees to maintain regular contact with the child as "foster grandparents." Wilms and Abell allegedly said that the decision was not theirs to make. Although none of the defendants ever gave the Kyees any reason to believe that a local adoption would be agreeable to the agency, and indeed continued to schedule out-of-town visits with the family that eventually adopted the child, the Kyees continued to hope for a local adoption. To that end they began arranging a series of visits by John Joe with a local couple, Robert and Isabelle Stout, who had sought for many years to adopt a child.

In late July, defendants informed the Kyees that on August 2, 1975, John Joe would be sent on another weekend visit to the out-of-state couple. On July 24th, on the advice of their attorney, the Kyees took John Joe on a ten-day family visit to Tennessee. Mrs. Kyees advised defendants of the trip by letter. On July 28th, the Stouts filed with the Tippecanoe Circuit Court a petition to adopt John Joe Bowling.

On August 5, 1975, the Circuit Court held an informal hearing at which named Defendant Ann Wilms stated that arrangements had been completed for John Joe, then close to three years old, to be adopted by a Kentucky family.

Also on August 5th, named Defendant Linda Abell called the Kyees to say that John Joe would be sent on a weekend visit with the Kentucky couple August 9–10. The child would be returned late Sunday night. Shortly after the child left for the weekend visit the defendants returned to the Kyees house to inform them that because of their emotional involvement with John Joe the child would not be returned. The record indicates that he has now been adopted.

On August 14, 1975, defendants moved in Circuit Court for summary judgment on the Stouts' adoption petition on the grounds that defendants did not consent to such adoption. On September 19, 1975, the court granted summary judgment in favor of defendants. The Stouts' appeal of that decision is currently pending before the Indiana Court of Appeals.

## II. PLAINTIFFS' FEDERAL CLAIMS

On September 30, 1975, a complaint was filed in federal district court naming Charles and Pauline Kyees, Robert and Isabelle Stout and John Joe Bowling as plaintiffs. The action arose under 42 U.S.C. § 1983 and jurisdiction was based on 28 U.S.C. § 1331(a), 1343, and 2241. In their complaint, plaintiffs charge the Tippecanoe County Department of Public Welfare and various agents of the Department with having deprived them of their constitutional rights under the First, Ninth, Tenth, and Fourteenth Amendments. One million dollars ($1,000,000) in damages is sought. Plaintiffs also seek such declaratory and injunctive relief as will reveal the whereabouts of John Joe Bowling, retract any adoption approval given by defendants regarding John Joe, declare the defendants' interference with the family relationship established by the Kyees and John Joe as an unconstitutional violation of their right to privacy, declare the defendants' removal of John Joe from the Kyees' home without notice or hearing a violation of due process, declare the defendants' failure to consider the adoption application of the Stouts or to give a reason for this failure a denial of equal protection and due process, return John Joe to the Kyees, and require defendants to approve the adoption of John Joe by the Stouts. Pending full adjudication, the plaintiffs requested that a temporary restraining order effectuating the equitable relief requested be entered.

On October 24, 1975, the district court denied the temporary restraining order.

On October 28, 1975, defendants filed a one-sentence answer to plaintiffs' complaint to the effect that no civil or constitutional right of plaintiffs had been violated and, therefore, no claim stated upon which relief could be granted. Defendants then moved for summary judgment.

On November 10, 1975, Martin Guggenheim, Acting Director of the Juvenile

Rights Project of the American Civil Liberties Union petitioned the court to appoint him guardian *ad litem* for John Joe Bowling. The court denied the request on December 10, 1975. On December 29, 1975, plaintiffs cross-petitioned for summary judgment.

The court, on May 19, 1976, denied plaintiffs' petition and granted summary judgment in favor of the defendants. The court restated the position it had taken in its order denying a temporary restraining order that plaintiffs' hopes to continue a relationship with John Joe could not be considered a property interest entitled to due process protection. As to whether the plaintiffs had a liberty interest in a continued relationship with the child, the court ruled that any familial rights or right to privacy that the Kyees had in regard to the care and custody of John Joe necessarily depended on the continuing validity of the foster relationship. Once John Joe was placed with another couple for adoption, that couple acquired familial rights and rights to privacy superior to those of the Kyees. Moreover, the court found that even if a liberty or property interest were here implicated, procedural due process would be required only to assure against an erroneous assessment of the facts. Here there were no facts in dispute. The determination of the Kyees' adoption petition had decided it was in the best interests of the child that the Kyees and John Joe terminate their relationship. The only objection to the foster relationship which the court could see the Kyees raising was that the choice of adoptive parents made by defendants was improper. Since the Kyees had themselves been denied their petition to adopt, the court found they lacked standing to raise such an objection. As to the child's interest in challenging defendants' methods for choosing among adoptive parents, the court found it, for all practical purposes, the same as that of the Stouts. As to the Stouts, the court stayed any consideration of their claims pending the outcome of their appeal of their adoption denial to the Indiana Court of Appeals.

On June 19, 1976, pursuant to Rule 54(b), *Fed.R.Civ.P.,* the district court entered final judgment upon defendants' motion for summary judgment against Charles and Pauline Kyees in favor of defendants and against the Kyees.

## III. THE NATURE OF PLAINTIFFS' INTERESTS

We have no difficulty in narrowing the case to the question whether the relationship between plaintiffs and John Joe created a liberty interest which the state could not impair without due process. We see no property interest involved, and no fundamental rights wholly beyond the power of the state.

Perhaps it could be argued, in the context of this case, that plaintiffs have had their "day in court." In 1974 they went into state court to establish a right to adopt John Joe, notwithstanding the opposition of defendants. The issue presented to the state court, and decided adversely to them, was clearly similar to the issue whether John Joe's best interests would be served by removal from their home in order to permit adoption. It may also be noted that except for the ruse by which John Joe was removed, defendants substantially apprised plaintiffs in advance of their plans for him. We do not, however, rest our decision on the proposition that adequate due process was provided.

It has long been clear that there exists a "private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). But it has not always been clear what constitutes a "family." Certainly, where a biological relationship exists, the power of the state to regulate activity is limited. *See e. g., Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Drollinger v. Milligan,* 522 F.2d 1220 (7th Cir. 1977). But what other "family-like" living arrangements are

protected from state regulation is more open to question. *Compare United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) with *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Thus, critical to the Kyees' claim of due process is resolution of whether or not they have achieved the status of a "family."

In *Smith v. Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.3d 14 (1977), the Supreme Court addressed foster family living arrangements, although it did not find it necessary to decide whether the arrangements before it had achieved such status that the state could not disrupt them without due process. The Court noted that while "the usual understanding of 'families' implies biological relationships," such relationships are "not exclusive determination of the existence of a family." 431 U.S. at 843, 97 S.Ct. at 2110. As crucial as blood relationship to the existence of a family are "the emotional attachments that derive from the intimacy of daily association." *Id.* The Court went on to recognize that,

> At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. *Id.*

The Court further observed that because foster families had their origins "in an arrangement in which the State has been a partner from the outset . . . it is appropriate [in determining the scope of the liberty interest at stake] to ascertain from state law the expectations and entitlements of the parties." *Smith v. Organization of Foster Families,* 431 U.S. 816, 846, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977).

■ Although the laws of Indiana do create an expectation that the status of children will be changed only when the change is in their best interest, Indiana Code (1971)

31–5–7–1, *supra* note 2, (*See also* Indiana Code (1971) 31–1–11.5–21 (regarding divorce proceedings); Indiana Code (1971) 31–3–1–8 (regarding adoptions); Indiana Code (1971) 31–5–7–1 (regarding delinquent, dependent, or neglected child proceedings); Indiana Code (1971) 29–1–18–25 (regarding guardianships); Indiana Code (1971) 12–3–3–2 (neglect or dependency hearings)), in this case, as in *Smith,* the likelihood or virtual certainty of eventual termination of the foster relationship is made clear in state statutes and in the contracts executed by the foster parents. Because they can be ended by the state, foster families must, then, be seen as enjoying a considerably more limited "liberty" than natural families or those related by adoption.

The Court, as already noted, decided *Smith* without determination whether the foster care relationship created a constitutionally protected liberty interest. The Court analyzed procedures required in New York before a foster child can be removed from foster parents, and concluded that these procedures were adequate to protect whatever liberty interests the parties might have. Nothing like the New York procedures are required in Indiana.

A similar situation came to the attention of the Fifth Circuit. In *Drummond v. Fulton Cty. Dept. of F. & Child. Serv.,* 547 F.2d 835 (5th Cir. 1977) a panel decided that foster parents in the situation considered "have a 'liberty' right of which the State cannot deprive them without a due process hearing." 547 F.2d at 853. Rehearing *en banc* was granted. The full court, with the benefit of the Supreme Court's discussion in *Smith,* decided that "there is no such constitutionally protected interest in the context of this case." *Drummond v. Fulton Cty. Dept. of Family, etc.,* 563 F.2d 1200, 1206 (5th Cir. 1977), *cert. denied* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978).[1]

In *Drummond* as well as here, there were facts indicating the development of strong emotional ties between the foster parents

---

1. Mr. Justice Brennan, the author of the opinion of the Court in *Smith,* and Mr. Justice White, one of those who joined in that opinion, would have granted *certiorari.*

and foster child. In both situations the foster care relationship continued for approximately two years before termination by the state agency. In each case, it could fairly be said that the foster parents at least had reason to believe that the state agency reserved the right to terminate the relationship.

A majority of this panel, Judges Pell and Foreman, are persuaded by the reasoning of *Drummond* as ultimately decided, and conclude that the question left open by the Supreme Court in *Smith* should be decided adversely to the existence of a liberty interest in a foster care arrangement of the nature and duration considered here. Judge Fairchild is of the opinion that a foster care arrangement of this type can produce a family in the sense described in *Smith;* that the members of such family have a liberty interest of which they cannot be deprived by the state without due process; and that plaintiffs are at least entitled to a trial at which they can demonstrate that they and John Joe constitute a family.

The judgment appealed from is AFFIRMED.