799 F.2d 582
 Jean GIBSON; Richard Gibson; and Susan S., a minor, By and
Through her next friend, Paul Tesler, Plaintiffs-Appellants,
v.
MERCED COUNTY DEPARTMENT OF HUMAN RESOURCES; Dean P.
Richmond, individually and as Director Merced
County Dept. of Human Resources; et
al., Defendants-Appellees.
 No. 85-2003.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 17, 1986.
Decided Sept. 12, 1986.
 
 Tracy L. Salisbury, Morrison & Foerster, San Francisco, Cal., for plaintiffs-appellants.
 James D. Weakley, Eldridge, Anderson & Weakley, Fresno, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California.
 Before SNEED, J. BLAINE ANDERSON, and POOLE, Circuit Judges.
 POOLE, Circuit Judge.
 
 
 1
 Jean and Richard Gibson and their adopted daughter Susan appeal the summary judgment granted against them on their 42 U.S.C. Sec. 1983 claim against the Merced County Department of Human Resources (the Department). The Gibsons allege that the Department's removal of Susan from their home while she was their foster child violated Susan's and their constitutionally protected liberty interests and their procedural due process rights.
 
 FACTS AND PROCEEDINGS
 
 2
 Susan was born in Hanford, Kings County, on October 28, 1977 to Sheryl Sheets, who because of personal problems voluntarily placed Susan in foster care with the Kings County Department of Social Services. Nine days later, the Kings County Department placed Susan in the Hanford home of Jean and Richard Gibson, who were licensed foster parents, with the intent that Susan would ultimately be reunified with her natural mother. While no foster care contract between the Gibsons and the Department was executed, the Gibsons were aware that Susan's placement with them was of a temporary nature.[1]
 
 
 3
 Because Sheryl moved to Merced County for treatment for her personal problems, jurisdiction over Susan's placement was transferred to the Merced Department.[2] That department continued with the plan, with which the Gibsons agreed, to reunify Susan and Sheryl. Dr. Feldman, a child psychiatrist who treated Susan for psychological and emotional problems, participated in working out an arrangement for meetings between Sheryl and Susan in the Gibson home. The program contemplated that it was essential that a bonding of child, foster mother and natural mother be established, and that the cooperation of all was necessary if it was to work.
 
 
 4
 In a September 4, 1980 meeting of Mrs. Gibson and the Department officials, it was recognized that Susan's placement would continue in the Gibson home until she was five years old, and that she might then be able to be reunified with Sheryl. Afterwards, however, Mrs. Gibson sent a letter to Pat Waddell, a nurse at the Central Valley Regional Center, stating that Mrs. Gibson no longer wanted to work toward reunification. Believing this to mean that Mrs. Gibson no longer wanted Susan, plans were made to remove Susan from the Gibson home. When Mrs. Gibson was contacted and advised that Susan was to be removed, she told Melodie Archer of Merced County that she did not want Susan removed.
 
 
 5
 The Department personnel were concerned that Mrs. Gibson appeared to be undermining the plan to reunify Susan with her natural mother. They decided that in Susan's best long-term interests, she should be removed from the Gibson home. Notice was sent to Mrs. Gibson of the decision, as well as her right to an administrative hearing challenging the decision.
 
 
 6
 An administrative hearing was held on September 30, 1980, with Dean Richmond, the director of the Department, presiding. Mr. Richmond decided that since Dr. Feldman had not participated in the hearing, the matter should be deferred for a full court hearing so that the court could exercise its subpena powers.
 
 
 7
 A court hearing was eventually set for February 19, 1981, before Judge Fretz of the Merced County Superior Court. The parties eventually stipulated to an order setting out a plan for an annual review and directing the Gibsons to work toward the reunification of Susan and Sheryl. The order specified that Susan would remain in the Gibson home for one year, unless a court order shortened that period. The Gibsons' attorney, Donaldson, assured Susan's appointed counsel, Dave Bultena, that the Gibsons were not seeking a court order to free Susan from parental custody and control.
 
 
 8
 On June 5, 1981, without notifying the Department or Judge Fretz, the Gibsons filed petitions in Superior Court in Kings County for Freedom from Parental Custody and Control and to adopt Susan.
 
 
 9
 At a meeting with Department personnel on June 25, 1981, the Gibsons, without mentioning that they had already filed an adoption petition, stated that they would be available to adopt Susan. Sheryl stated that she would never consent to that. Later that day or the next day, the petitions were served on the Department.
 
 
 10
 Susan's attorney and the County attorney decided that it would be in Susan's best interest to advise Judge Fretz of the Gibsons' attempt to violate his ordered plan to work toward reunification. After Judge Fretz met with County Counsel ex parte, he ordered that Susan be removed from the Gibson home.
 
 
 11
 The Department personnel were aware of Susan's emotional problems based on Dr. Feldman's diagnosis and on Dr. McDonald's initial evaluation, which had found indications of some mild emotional problems in Susan's excessive reactions against change and her difficulty in adapting to new social situations. It was decided that giving the Gibsons notice of the court-ordered removal would create a more traumatic environment for Susan, since it was likely that the Gibsons would resist the move.
 
 
 12
 Prior to moving Susan, the Department was unable to consult with Dr. Feldman because he was out of the country, so a child psychiatrist in Merced, Dr. Lloyd, was consulted. He agreed to see Susan on an emergency basis if necessary and to treat her on a continuing basis once she was moved from Hanford to Merced. A psychiatric nurse, Jean Welch, and an officer of the Hanford police department accompanied Department personnel Liz Freitas and Mabel Patten on July 9, 1981, to remove Susan from the Gibson home. Although Susan cried for about half an hour during the removal and subsequent automobile trip to Merced, the nurse concluded that such behavior was appropriate for the circumstances and Susan's age.
 
 
 13
 Susan was taken to the home of Mr. and Mrs. Koehn, foster parents in Merced County, who had experience with emotionally disturbed children. As a matter of policy, the Department did not disclose Susan's whereabouts to the Gibsons nor permit them any contact with her. While in Merced, Susan was seen by Dr. Lloyd, who concluded that Susan should be returned to the Gibson home. However, because Mrs. Koehn indicated that Susan "seemed very happy" in the Koehn home, the Department sought a complete evaluation of Susan at Stanford University Children's Hospital. Before this could be done, the Gibsons petitioned the California Court of Appeals to return Susan to their home. On August 5, 1981, that court, concluding it to be in Susan's best interests, issued a peremptory writ of mandate directing the Merced County Superior Court to vacate its July 1, 1981 order, directing the Department to return Susan to the custody of the Gibsons, and ordering the Gibsons to cooperate with the Department's plan to secure the Stanford evaluation.
 
 
 14
 In January 1982, after evaluation at Stanford, it was concluded that Susan suffered from a type of childhood emotional illness, and that it was in her best interests to remain in the Gibson home. Based upon the Stanford evaluation, the Department abandoned the reunification plans and worked towards Susan's permanent placement with the Gibsons. The Gibsons adopted Susan on May 1, 1984.
 
 
 15
 On July 1, 1983, the Gibsons filed a complaint under 42 U.S.C. Sec. 1983 against the Department, its Director Dean P. Richmond, the Deputy Director John Cullen, and Supervisors Melodie Archer and Mabel Patten. An amended complaint alleged that the defendants "intentionally, arbitrarily, and capriciously sought and obtained an order to remove Susan ... with full knowledge of the serious and adverse physical and emotional consequences their decisions and actions would have on Susan, and with deliberate indifference to Susan's serious medical needs." The complaint also alleged that the Gibsons had a constitutional right to notice and a right to be heard prior to the removal of Susan from their home and that this right was violated by the issuance and execution of Judge Fretz's ex parte order of removal.
 
 
 16
 The district court granted in part defendants' motion for summary judgement, ruling inter alia that (1) the Gibsons did not have a constitutionally protected liberty interest in the integrity of their foster family relationship, (2) that Susan had no constitutionally protected liberty interest in the circumstances of this case, (3) that the post-removal remedies available to and utilized by the plaintiffs were adequate to safeguard any interest they might have had, (4) that the individual defendants were entitled to quasi-judicial immunity, and (5) that the individual defendants were entitled to qualified good faith immunity. The court denied the defendants' motion for attorney fees and ordered the action dismissed. The Gibsons and Susan timely appealed.
 
 STANDARD OF REVIEW
 
 17
 We review de novo a grant of summary judgment. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986). A party is entitled to summary judgment only if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir.1985); Fed.R.Civ.P. 56(c).
 
 DISCUSSION
 A. The Gibsons
 
 18
 In order to make out a claim of deprivation of Fourteenth Amendment due process rights, a plaintiff must demonstrate first that he had been deprived of liberty or property in the constitutional sense and then that the procedure used to deprive him of that interest was constitutionally defective. See Board of Regents v. Roth, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The district court concluded that the Gibsons did not have a constitutionally protected liberty interest in the continued placement of Susan in their home. The court relied on several decisions by other circuits to support its conclusion. See Kyees v. County Department of Public Welfare, 600 F.2d 693, 694 (7th Cir.1979) (per curiam); Drummond v. Fulton County Department of Family and Children's Services, 563 F.2d 1200, 1206 (5th Cir.1977) (en banc), cert. denied, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); Sherrard v. Owens, 484 F.Supp. 728, 741 (W.D.Mich.1980), aff'd, 644 F.2d 542 (6th Cir.) (per curiam), cert. denied, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). Those decisions in turn relied in large part on the Supreme Court's decision in Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) ("OFFER").
 
 
 19
 In OFFER, the Supreme Court addressed the issue whether, as against the state and city officials, a class of long term New York foster parents had a protectible liberty interest in the preservation of their foster families, but declined to decide it under the facts of that case. The New York foster parents argued that when a child has lived in a foster home for over a year, psychological and familial ties are created which imbue foster parents with a liberty interest in the survival of the foster family sufficient to invoke the protections of the Due Process Clause against removal. Id. at 839, 97 S.Ct. at 2106.
 
 
 20
 The OFFER court noted two important distinctions between the typical foster family and the natural family. First, the source of the foster family relationship is contractual in nature and is carefully circumscribed by the state in the foster care agreement. Id. at 845, 97 S.Ct. at 2110. Thus, "it is appropriate to ascertain from state law the expectations and entitlements of the parties." Id. at 845-46, 97 S.Ct. at 2110. Second, there is a virtually unavoidable tension between protecting the liberty interests of the natural parents while also extending familial rights in favor of the foster parents. Id. at 846, 97 S.Ct. at 2110. The Court declined to decide whether foster parents have a protected liberty interest, because even assuming that they do, New York's procedures were constitutionally adequate. Id. at 847, 97 S.Ct. at 2111.
 
 
 21
 Justice Stewart, in a concurring opinion joined in by two other justices, stated that he "would squarely hold that the interests asserted by the appellees are not of a kind that the Due Process Clause of the Fourteenth Amendment protects," id. at 858, 97 S.Ct. at 2117, because the state "confers no right on foster families to remain intact, defeasible only upon proof of specific acts or circumstances," id. at 859, 97 S.Ct. at 2117, nor does state law provide a "basis for a justifiable expectation on the part of foster families that their relationship will continue indefinitely," id. at 860, 97 S.Ct. at 2118. He also noted thatunder New York's foster-care laws, any case where the foster parents had assumed the emotional role of the child's natural parents would represent not a triumph of the system, to be constitutionally safeguarded from state intrusion, but a failure. The goal of foster care, at least in New York, is not to provide a permanent substitute for the natural or adoptive home, but to prepare the child for his return to his real parents or placement in a permanent adoptive home by giving him temporary shelter in a family setting. Thus, the New York Court of Appeals has recognized that the development of close emotional ties between foster parents and a child may hinder the child's ultimate adjustment in a permanent home, and provide a basis for the termination of the foster family relationship. Perhaps it is to be expected that children who spend unduly long stays in what should have been temporary foster care will develop strong emotional ties with their foster parents. But this does not mean, and I cannot believe, that such breakdowns of the New York system must be protected or forever frozen in their existence by the Due Process Clause of the Fourteenth Amendment.
 
 
 22
 Id. at 861-862, 97 S.Ct. at 2118-2119 (emphasis in original) (citations and footnotes omitted).
 
 
 23
 The Fifth, Sixth, and Seventh Circuits have relied on the distinguishing factors discussed by the OFFER majority to support rulings that foster parents do not possess a constitutionally protected liberty interest in the maintenance of the foster family relationship. Kyees, 600 F.2d at 699; Drummond, 563 F.2d at 1207; Sherrard, 484 F.Supp. at 741, aff'd, 644 F.2d at 543.
 
 
 24
 In Sherrard, the contract between the state agency and the foster parents provided specifically that the state agency retained responsibility for permanent placement of the foster children. The Sixth Circuit concluded that plaintiffs therefore had at most only an expectation of continuing as foster parents and that this did not rise to the level of a constitutionally protected liberty interest. 644 F.2d at 543.
 
 
 25
 In Drummond, the court rejected the plaintiffs' argument that the mutual feelings of love and dependence which developed between them and their foster child caused the foster relationship to be protected by the familial right to privacy. Cf. Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). Referring to the portion of Justice Stewart's OFFER concurrence quoted at length above, the court noted that "the only time potential parents could assert a liberty interest as psychological parents would be when they had developed precisely the relationship which state law warns against [in] the foster context." Drummond, 653 F.2d at 1207.
 
 
 26
 In Kyees, a majority of the three judge panel explicitly followed the reasoning in Drummond. 600 F.2d at 699. As in Drummond, the foster care contract between the plaintiffs and defendants clearly did not create any expectation of a continuing relationship between the foster parents and child. See id. at 695.
 
 
 27
 As noted by the Supreme Court, "[f]oster care of children is a sensitive and emotion-laden subject." OFFER, 431 U.S. at 833, 97 S.Ct. at 2103. There is no doubt that with a child such as Susan, who was placed in foster care at a very young age and who has remained in the same foster care for much of her developmental years, a strong attachment can develop between that child and her foster parents. Nevertheless, we have cautioned that "foster parents do not enjoy the same constitutional protections that natural parents do." Backlund v. Barnhart, 778 F.2d 1386, 1389 (9th Cir.1985) (citing Kyees, Drummond, and Sherrard ). Here, it is clear that while no foster care contract existed between the Department and the Gibsons, the Gibsons knew that the arrangement was intended to be temporary and to result in Susan's reunification with her natural mother. Such, in fact, is an express goal of foster care in California. Cal. Welf. & Inst. Code Sec. 396 (West 1984). This factor strongly weighs against finding the liberty interest asserted by the Gibsons, or at least suggests that any such interest is quite limited. However, like the Court in OFFER, we need not decide whether the Gibsons' interest in having Susan remain in their care rose to the level of a protectible liberty interest under the Fourteenth Amendment since we conclude that the procedures employed by defendants in this case satisfied due process requirements.
 
 
 28
 In determining the quantum of process due in a foster removal context, the OFFER court applied the test of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which held that
 
 
 29
 identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 30
 OFFER, 431 U.S. at 848-49, 97 S.Ct. at 2111-12 (quoting Mathews, 424 U.S. at 335, 96 S.Ct. at 903). Applying these factors to the procedures employed by the Department in removing Susan from the Gibson home, we conclude that those procedures satisfied constitutional standards.
 
 
 31
 The Department sought to remove Susan from the Gibson home in order to place her in a different foster home. Thus, the Gibson's contend that whatever their liberty interest may be, this interest is somewhat stronger than if the Department had removed Susan in order to return her to her natural mother. See id. at 853, 97 S.Ct. at 2114 ("[W]hatever liberty interest may be argued to exist in the foster family is significantly weaker in the case of removals preceding return to the natural parent * * *."). Even so, as our previous discussion indicates, the California system of foster care as well as the understandings of the Gibsons concerning their limited role as foster parents cautions for recognizing at best only a most limited constitutional "liberty" interest in the foster family.
 
 
 32
 The Department first contemplated removing Susan from the Gibson home in September 1980, after Mrs. Gibson sent the letter stating that she no longer wanted to work toward reunification of Susan with her natural mother. Upon being informed of the Department's decision, the Gibsons invoked their right to an administrative hearing. At the hearing, the director of the Department decided that a full court hearing was necessary, and such a hearing was eventually held before Judge Fretz of the Merced County Superior Court. At this hearing, the Gibsons had an opportunity to criticize and voice any opposition to continuation of the Department's reunification plan. The Gibsons were aware of Susan's emotional problems, including her difficulty in forming any sort of relationship with her natural mother. Whereas they could have asked the court to direct that the reunification plan be abandoned and that Susan be available for adoption, the Gibsons instead stipulated to an order directing them to continue working toward reunification.
 
 
 33
 The Gibsons, however, argue that this opportunity was inadequate and that they were entitled to another hearing before the Department actually removed Susan. The Department, however, only sought the order of removal after it discovered that the Gibsons had filed a petition to adopt Susan. This petition was directly contrary to the stipulated order that the Gibsons cooperate and work toward reunification of Susan and her natural mother. In addition, Judge Fretz had indicated at the hearing that if any of the parties became dissatisfied with the current plan, they should inform the court and it would try to resolve any problems. Thus, the Gibsons had a continuing opportunity to challenge the Department's plan with respect to Susan. In these circumstances, we conclude that due process did not require a full hearing before the court could order Susan removed from the Gibson home. Moreover, the benefits of requiring such a hearing are far from clear.[3] There is little that the Gibsons could have said to the court that they could not have said at the earlier hearing or by way of a petition. Thus, the administrative burden of requiring such a hearing "would be balanced by little gain in accuracy of decisionmaking." OFFER, 431 U.S. at 852 n. 59, 97 S.Ct. at 2114, n. 59.
 
 
 34
 As noted by the Supreme Court, the area of foster care involves "issues of unusual delicacy, * * * where professional judgments regarding desirable procedures are constantly and rapidly changing." Id. at 855, 97 S.Ct. at 2115. Consequently, federal courts should be hesitant to import rigidity of procedure in an area where the state's interest is not only great, but where there also exists a need for flexibility in order to accomplish what is best for a particular child. We hold that the procedures afforded the Gibsons in this case were adequate to protect whatever liberty interests they may have had in the continuation of their relationship with Susan, and thus we affirm the summary judgment on this claim.
 
 B. Susan
 
 35
 In the complaint filed on her behalf, Susan alleged that the Department and its officials acted arbitrarily and with deliberate indifference to her serious medical needs in procuring and enforcing the removal order, thereby violating Susan's Fourteenth Amendment "liberty" interest in personal security and freedom from harm.
 
 
 36
 The Fifth Circuit has held, and the Supreme Court has suggested, that a foster child has no constitutionally protected liberty interest in remaining in a particular foster home. In Drummond, the foster child claimed a liberty right which he chose to call the "right to a stable environment," 563 F.2d at 1208, arguing that "a child has a liberty right not to be moved from home to home, without a prior hearing, particularly in light of the significant literature which indicates a traumatic effect of such moves on young children." Id. The Fifth Circuit held that the foster child has no such liberty interest, id. at 1209, because the foster child could point to no source for a right in conflict with the state program which interrupted his environment only to move him to a place which it considered superior and in his best long-term interests, and analogized the situation to that in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which spoke against such an interest. Meachum held that a prisoner is not entitled to a hearing when he is transfered even to a prison with substantially less favorable conditions, absent a state law or practice conditioning such transfers on proof of serious misconduct or the occurrence of other events. 427 U.S. at 216, 96 S.Ct. at 2534.[4]
 
 
 37
 Susan, however, argues that the point at issue is not her right to remain in the Gibson home, but her right to be free from the arbitrary infliction of medical harm. See Doe v. New York City Department of Social Services, 649 F.2d 134 (2d Cir.1981) (court allowed a foster child's section 1983 claim against a supervisory social service agency for the agency's deliberate indifference in failing to discover and protect the child from physical and sexual abuse by the foster father). Assuming that a foster child has a constitutionally protected right to be free from arbitrary infliction of harm by the state or county agency charged with protection of that child through its deliberate indifference to the child's medical needs, we find that the actions by the Department in this case did not violate such a right.
 
 
 38
 In determining whether a substantive right protected by the Due Process Clause has been violated, we must "balance 'the liberty of the individual' and 'the demands of an organized society.' " Youngberg v. Romeo, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982). Borrowing from the prisoner treatment cases, Susan argues that social service officials' deliberate indifference to serious medical needs of foster children constitutes a violation of the Fourteenth Amendment. Cf. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment). Susan, however, has failed to present any specific facts which would cast doubt on the Department's assertion and extensive supporting materials showing that they were acting in Susan's best long term interests in removing her from the Gibson home. The Department had been working for several years to reunify Susan with her natural mother. At the time of Susan's removal such a plan had not been abandoned. Department officials, however, found themselves faced with uncooperative foster parents who, without notifying the Department or consulting with any of the caseworkers, had instituted legal action to terminate the attempt at reunification by legally adopting Susan. Assuming that the Department knew the extent of Susan's illness, its decision to remove Susan cannot be said to be arbitrary in light of the Gibsons' conduct.
 
 
 39
 Nor was the manner of the removal unreasonable. Removal of a young child from a home she has lived in for several years is inevitably traumatic. The emotional impact of removal in this case was heightened by Susan's particular psychological problems as well as the prospect of uncooperative foster parents. Realizing this, the Department officials arrived at the Gibson home with a psychiatric nurse and a local police officer. After removing her from the home, Susan was taken to foster parents who specifically had experience with emotionally disturbed children. While there, Susan received competent care, including psychiatric care. She remained at the new home until the California Court of Appeals determined that she should be returned to the Gibsons.
 
 
 40
 As it turned out, the Department's decision to remove Susan from the Gibson home was infelicitous. However, hindsight alone is not enough to establish a constitutional violation. We must examine the officials' actions in the context in which they occurred. Moreover, we must be mindful that "courts must show deference to the judgment exercised by a qualified professional." Youngberg, 457 U.S. at 322, 102 S.Ct. at 2461. In Youngberg, the plaintiff, an involuntarily committed mentally retarded person, was held to enjoy constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by those interests. 457 U.S. at 324, 102 S.Ct. at 2462. The Court noted that in determining whether the State had met these obligations, the decisions made by appropriate professionals are to be presumed correct. Id. "The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages." Id. at 324-25, 102 S.Ct. at 2462-63. In this case, the steps taken by the Department were entirely reasonable in light of the circumstances. Because Susan has not raised a genuine issue of fact that the officials were deliberately indifferent to her medical needs, the summary judgment is affirmed.
 
 C. Attorney Fees
 
 41
 Both parties request attorney fees on appeal. The requests are denied.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 California law provides
 It is the policy of the Legislature that foster care should be a temporary method of care ..., that reunification with the natural parent or parents or another alternate permanent living situation such as adoption or guardianship are more suitable to a child's well-being than is foster care....
 Cal. Welf. & Inst. Code Sec. 396 (West 1984)
 
 
 [2]
 Susan was declared a Dependent Child of the Merced County Juvenile Court on July 19, 1979
 
 
 [3]
 In Drummond, the Fifth Circuit noted that the issue whether to move a child from a foster home involves essentially policy inquiries and not the resolution of factual disputes; thus the utility of a structured trial-type hearing is doubtful. 563 F.2d at 1210
 
 
 [4]
 In OFFER, the Supreme Court pointed to Meachum in rejecting the foster child's argument that the disruption of stable relationships needed by a child constitutes a "grievous loss" sufficient to trigger due process protection. 431 U.S. at 840, 97 S.Ct. at 2107