Joseph and Marjorie PROCOPIO,
Plaintiffs–Appellants,

v.

Gordon JOHNSON, Former Director, Illinois Department of Children and Family Services; Jess McDonald, Former Interim Director, Illinois Department of Children and Family Services; Sue Suter, Former Director, Illinois Department of Children and Family Services; Sterling M. Ryder, Director, Illinois Department of Children and Family Services; Hephzibah Children's Association, a Not–For–Profit Corporation; and Lutheran Child and Family Services, a Not–For–Profit Corporation, Defendants–Appellees.

No. 92–1913.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1992.

Decided May 6, 1993.

William F. Dolan (argued), Robert P. Cummins, Bickel & Brewer, Chicago, IL, for Joseph and Marjorie Procopio.

Mitchell Ware, Frank M. Grenard, Eric S. Wachspress, Dianne McCollough, Robin P. Charleston, Jones, Ware & Grenard, Chicago IL, for Sue Suter.

Dennis Minichello (argued), Michael C. O'Neil, Keck, Mahin & Cate, George F. Galland, Jr., Davis, Miner, Barnhill & Galland, Chicago, IL, for Hephzibah Children's Ass'n.

William E. Spizzirri, Nancy J. Arnold, Kralovec, Jambois & Schwartz, Harvey J. Cohen, Merrill C. Hoyt, Aries, Hoyt & Taden, Chicago, IL, for Lutheran Child and Family Services.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and CRABB, District Judge.*

CUDAHY, Circuit Judge.

The plaintiffs, hoping to adopt a child, became foster parents to a little girl born to an active drug addict. They nursed her through chronic narcotic withdrawal and cared for her for five years. When the birth parents successfully sought to have custody of the girl returned to them, the plaintiffs sued, asserting a violation of 42 U.S.C. § 1983 in addition to state law claims. The district court dismissed the case. We affirm.

I.

The lamentable story of Ashley K.'s childhood began on April 27, 1984, when Ashley was born to a drug-addicted woman who had

---

* The Honorable Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation.

used heroin and cocaine and prostituted herself during the pregnancy.[1] On May 3, 1984, Ashley was found to be a neglected and dependent minor and was placed in the custody of the Illinois Department of Children and Family Services (DCFS).

About the same time, the plaintiffs, Joseph and Marjorie Procopio, contacted defendant Lutheran Child and Family Services (LCFS) to inquire about how they might adopt a child. LCFS informed the Procopios that they would have a better chance to adopt if they became licensed foster parents. The Procopios complied, received their foster parents license in April 1984 and became foster parents to Ashley about a month later. Apparently LCFS and DCFS officials repeatedly led the Procopios to believe that almost no significant barriers would prevent their adoption of Ashley and that she was "97% adoptable." *In the interest of Ashley K.,* 212 Ill. App.3d 849, 156 Ill.Dec. 925, 927, 571 N.E.2d 905, 907 (1 Dist.), *appeal denied,* 141 Ill.2d 541, 162 Ill.Dec. 489, 580 N.E.2d 115 (1991).

During the first 16 months of Ashley's life, she was visited by her mother three times and her father twice.[2] Ashley's mother, who had a significant arrest record for theft, child neglect, prostitution, forgery and possession of stolen property, was reported using heroin in March 1985. The DCFS nevertheless developed a service plan on April 25, 1985, to work toward the goal of returning Ashley to her parents and to maintain an older sister and brother in the family home as well. On May 8, 1985, however, the state circuit court found Ashley's parents, who remained unmarried but who had lived together since 1980, unfit to care for her and granted guardianship to the DCFS. Ashley continued to experience withdrawal tremors and

high fevers, but was otherwise progressing well with the Procopios. The September 4, 1985, update of the DCFS service plan continued to indicate a goal of returning Ashley to her biological parents.

In February 1986, Ashley's mother, who was completing a methadone drug treatment program, was charged with child abandonment, and her son and older daughter were taken into protective custody. She was arrested for prostitution in March 1986. On December 9, 1986, the circuit court found her to be an unfit parent, and the DCFS received guardianship of the two older children.

Two days later Ashley's mother entered an in-patient drug program, but left the program in March 1987 prior to completion. She enrolled instead in an outpatient methadone maintenance program. In June 1987 Ashley's mother purchased a house with her own mother; Ashley's father, who lived in the house with Ashley's mother and grandmother, also entered a methadone maintenance program.

Ashley's biological parents filed a juvenile court petition on December 29, 1988, seeking custody of Ashley. Although various psychological reports recommended that Ashley should remain with the Procopios, DCFS supported her return to her biological parents. In April 1989, DCFS began working with defendant Hephzibah Children's Association on a plan to effect Ashley's move. In July 1989, DCFS took Ashley from the Procopios and placed her with Hephzibah. At this point Ashley's parents had not used drugs for more than a year and had completed a DCFS service plan. On August 29, 1989, the juvenile court returned custody of Ashley to her natural parents.[3]

---

1. The Illinois Appellate Court explains in great detail the circumstances surrounding Ashley's birth and early upbringing. *See In the Interest of Ashley K.,* 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905 (1 Dist.), *appeal denied,* 141 Ill.2d 541, 162 Ill.Dec. 489, 580 N.E.2d 115 (1991).

2. Despite having visiting privileges, Ashley's mother and father saw her on only seven occasions during 1985. In 1986, they visited her only twice, although at least 16 appointments for visitation were scheduled.

3. The Illinois Appellate Court reversed the juvenile court and ordered a new hearing on Ashley's custody. *Ashley K.,* 156 Ill.Dec. at 944, 950, 571 N.E.2d at 924, 930. The court held that the circuit court order transferring custody of Ashley to her biological mother and father was "palpably against the manifest weight of the evidence and an abuse of discretion, and must be reversed," *id.* at 944, 571 N.E.2d at 924, and ordered that the circuit court base its decision regarding Ashley's custody "solely on the best interest of Ashley." *Id.* at 950, 571 N.E.2d at 930. On remand—more than two years after

On August 29, 1992, the Procopios filed a three-count complaint in federal court against the DCFS, DCFS directors, Hephzibah and LCFS. This case presents a story of what must have been a severe and prolonged emotional trauma to Ashley, but the problem presented to the federal courts is a narrower one than that. The Procopios asserted one federal claim under 42 U.S.C. § 1983 alleging violation of their Fourteenth Amendment due process rights and two state claims alleging fraudulent misrepresentation and intentional infliction of emotional distress. Concluding that the Procopios failed to demonstrate that their long-term foster relationship with Ashley or the DCFS's assurances of adoption created a liberty interest, the district court dismissed the section 1983 claim for failure to state a claim upon which relief can be granted. *Procopio v. Johnson*, 785 F.Supp. 1317, 1320 (N.D.Ill. 1992). The court declined to exercise supplemental jurisdiction over the remaining state claims and dismissed them as well. *Id.* The Procopios appeal.

## II.

We review the district court's dismissal of the plaintiffs' claims *de novo*. The Procopios' section 1983 action requires them to prove that they have a liberty interest in their family relationship with Ashley that the state could not impair without due process.[4] If they demonstrate such an interest, they then must show that the process accorded them was not constitutionally adequate. The Procopios contend that their liberty interest in their family relationship with Ashley derives from Illinois state law and from the federal statutory scheme governing reimbursement for various state and child welfare services, the Adoption Assistance and Child Welfare

Act of 1980, 42 U.S.C. §§ 620–628, 670–679a (1980). We address these in turn.

The power of the state to regulate biological family relationships is limited. *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). How far that limitation extends to nonbiological families is less clear. The Supreme Court has recognized that biological relationships are not the "exclusive determination of the existence of a family" and that emotional attachments play a role as well. *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843–44, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977). But the Court has stopped short of deciding that foster family arrangements achieve the status of a liberty interest that states cannot disrupt without due process. *See id.* at 847, 97 S.Ct. at 2111.[5] The scope of the liberty interest at stake, according to the Court, is appropriately ascertained from the parties' expectations and entitlements as they are set out in state law. *Id.* at 846, 97 S.Ct. at 2110; *Lindley v. Sullivan*, 889 F.2d 124, 130 (7th Cir.1989) (stating that a foster family's rights arise from state statute).

The Procopios contend that two different state law provisions support their claim that their relationship with Ashley amounts to a liberty interest. First, they argue that the Illinois Adoption Act confirms that foster parents are to be preferred above all others as the foster child's permanent family. Specifically, paragraph 1519.1 provides that the child's legal guardian "shall give preference and first consideration to [the foster parents'] application over all applications for adoption of the child but the guardian's final decision shall be based on the welfare and best interest of the child." Ill.Rev.Stat. ch. 40, ¶ 1519.1(b).

Ashley had been moved to her biological parents' home—permanent custody was again granted to them.

4. Section 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and [federal] laws." 42 U.S.C. § 1983.

5. *Smith* found it unnecessary to resolve the question because the procedures employed by the

state were adequate to protect whatever liberty interests the plaintiffs might have. 431 U.S. at 856, 97 S.Ct. at 2115. The Court did note, however, that "[w]hatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents." *Id.* at 846–47, 97 S.Ct. at 2111.

We agree with the district court that this statutory language does not suffice to create a liberty interest in the Procopios' family relationship. Notwithstanding the preference state law grants to foster families seeking to adopt their foster children, this priority does not rise to the level of an entitlement or expectancy. *Cf. Johnson v. Burnett*, 182 Ill.App.3d 574, 579, 131 Ill.Dec. 517, 522, 538 N.E.2d 892, 897 (1989) (describing a foster parent's role in Illinois as "that of a temporary way station on the road of a child's life," not a family for whom a future permanent situation is guaranteed). State law still requires that foster families who wish to adopt obtain the permission of the natural parents, Ill.Rev.Stat. ch. 40 ¶ 1510(a), or of the legal guardian if the natural parents' rights have been terminated, as they were here. *Id.* at ¶¶ 1510(b), 1519.1(a). Even given that permission, the Juvenile Court has the "sole discretion" to make the "final determination" about the adoption. *Id.* at ¶ 1519.1(c). Ashley's guardian, the DCFS, never granted that consent, nor did the Procopios receive juvenile court approval of their adoption of Ashley.[6]

■ Second, the Procopios claim that the Illinois Juvenile Court Act of 1987, Ill.Rev. Stat. ch. 37, ¶ 801-1 *et seq.*, supports an expectancy of a permanent relationship with Ashley. The Act's statement of purpose indicates that, where possible, a minor removed from his or her family should be placed "in a family home so that he or she may become a member of the family by legal adoption or otherwise." *Id.* at ¶ 801-2(1).

We are not persuaded that this language in the Juvenile Court Act serves to create a liberty interest in the Procopios' family relationship. As the language preceding the quoted passage makes clear, the Act strives foremost to secure appropriate care and guidance for each child "in his or her own home" and to "strengthen the minor's family ties whenever possible." *Id.* Indeed, when guardianship is not feasible within the child's own home, the Act does advocate placing the child in a "family home" that affords the equivalent of parental care and discipline. Yet the Act's opening policy statement introduces this option as a subordinate alternative to the expressly preferred course of maintaining children in their own (original) home.[7] Further, although the Act unmistakably endorses efforts to provide a home-like environment to children whose parents' custodial rights have been suspended or terminated, the legislature's articulation of this aim neither nullifies the state's ultimate prerogative to terminate the foster family unit nor otherwise confirms any legally cognizable expectancy in the foster family's permanence.

In addition, the Procopios have difficulty overcoming this court's decision in *Kyees v. County Dep't of Public Welfare*, 600 F.2d 693 (1979), where we held that Indiana law did not create a constitutionally protected liberty interest in a foster family's relationship that required due process before it was disrupted. *Id.* at 699. *Kyees* acknowledged that Indiana law creates an expectation that the foster child's situation will be altered only when in

6. However imprudent or unauthorized any of the defendants' assurances to the Procopios may have been, we do not believe such promises transform the Procopios' expectation of adopting Ashley into an entitlement. Such a liberty interest derives from state law; the defendants' promises were not supported by state law, and certainly not in any "explicitly mandatory language." *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989) (noting that a state creates a liberty interest when it uses "explicitly mandatory language" requiring a specific outcome under certain conditions).

7. The statement provides:

   Purpose and policy. (1) the purpose of this Act is to secure for each minor subject hereto

such care and guidance, preferably in his or her own home, as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her welfare or safety or the protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his or her own family, to secure for him or her custody, care and discipline as nearly as possible equivalent to that which should be given by his or her parents, and in cases where it should and can properly be done to place the minor in a family home so that he or she may become a member of the family by legal adoption or otherwise.

Ill.Rev.Stat. ch. 37, ¶ 801-2 (1991).

her best interest, but concluded that the law makes clear "the likelihood or virtual certainty of eventual termination of the foster relationship." *Id.* at 698.

Admittedly, *Kyees* addressed Indiana law, not Illinois law. But even if, as the Procopios argue, Illinois endorses more strongly than Indiana the idea of permanent foster care, the language in *Kyees* is telling. The *Kyees* court stated that "[b]ecause they can be ended by the state, foster families must, then, be seen as enjoying a considerably more limited 'liberty' than natural families or those related by adoption." *Id.* at 698. Despite the differing emphases on the possible permanence of foster families, the state's ultimate power to terminate those arrangements—a power that both Illinois and Indiana have—is dispositive. Under *Kyees* and Illinois statutory provisions that actually curb foster families' expectations of permanent family relationships, the foster family's existence is subject to the state's determination that it should continue, and Illinois law can create no expectancy of a constitutionally protected liberty interest. *See also Drummond v. Fulton County Dep't of Family & Children's Serv.*, 563 F.2d 1200, 1207 (5th Cir.1977) (concluding that "in the eyes of the state, which creates the foster relationship," the relationship gives rise to no state-created right), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978).

The Procopios also argue that section 1983 provides a remedy for the defendants' violation of federal law—in this case, the Adoption Assistance and Child Welfare Act of 1980 (AACWA), 94 Stat. 500, 42 U.S.C. §§ 620–28, 670–79a (1980).[8] Appellants' Br. at 27. The AACWA provides for federal reimbursement of a percentage of expenses for states' administration of foster care and adoption services when states satisfy the Act's requirements. 42 U.S.C. §§ 672–674, 675(4)(A) (1988 ed. and Supp. I). Specifically, the Procopios invoke section 675(5)(C),

which assures each foster child under state supervision "a dispositional hearing to be held . . . no later than eighteen months after the original placement." 42 U.S.C. § 675(5)(C). That hearing "shall determine the future status of the child (including . . . whether the child should be returned to the parent, should be continued in foster care for a specified period, should be placed for adoption, or should . . . be continued in foster care on a permanent or long-term basis) . . . ." *Id.*

■ Section 1983 is available as a remedy for violations of federal statutes where the statute itself creates enforceable rights. *Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). In the recent case of *Suter v. Artist M.*, —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), however, the Supreme Court held that another provision of the AACWA does not create rights enforceable under section 1983. The decision involved section 671(a)(15), which required states to have a plan providing for reasonable efforts to prevent removal of children from their homes and to facilitate reunification of families. 42 U.S.C. § 671(a)(15). The Court ruled, *inter alia*, that the provision was nonmandatory in all relevant respects and that Congress did not unambiguously confer upon the Act's beneficiaries the right to enforce the "reasonable efforts" requirement. 112 S.Ct. at 1367–70.

■ The plaintiffs contend that section 675(5)(C) is distinguishable from the provision considered in *Artist M.* and *does* create a federal right enforceable under section 1983. Appellants' Br. at 28–29. The Supreme Court has developed a three-part inquiry for evaluating a federal law's enforceability under section 1983: that inquiry examines (1) whether "the provision in question was intended to benefit the putative plain-

---

8. Despite the Procopios' repeated suggestion that a timely hearing would have ensured their adoption of Ashley, *see, e.g.*, Appellants' Br. at 31 ("Ashley would be with them today."), their remedy in a successful section 1983 suit directly under the AACWA—if one were permitted—presumably would be procedural rather than sub-

stantive. Even in the case of a constitutional violation, the Supreme Court has confirmed that the denial of procedural due process is actionable only for nominal damages without proof of actual injury. *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978).

tiff," and if so, (2) whether the provision reflects merely a congressional preference instead of a binding obligation or (3) whether the interest the plaintiff asserts is so "vague and amorphous" that it is "beyond the competence of the judiciary to enforce." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) (citations omitted).[9]

We first examine whether section 675(5)(C) is intended to benefit the plaintiffs. On its face, the section defines the required "case review system" as a procedure for assuring that "procedural safeguards will be applied ... *to assure each child in foster care ... of a dispositional hearing*" within 18 months. 42 U.S.C. § 675(5)(C) (emphasis added). This language indicates a clear intent to benefit the children. The language following this assurance of timely dispositional hearings bolsters this conclusion by spelling out that such a hearing could bring about various outcomes—including the return of the foster child to the parent. *Id.* Under the plain language of the provision, then, it is difficult to conclude that Congress intended section 675(5)(C) to benefit foster parents such as the Procopios, particularly when the application of the provision presumably operates against the foster parents' interest in some instances.[10] Even though enforcement of the timely hearing requirement may have benefited the Procopios in this particular case, such a conclusion is speculative and that potential benefit was not Congress's focus in section 675(5)(C). *See* 42 U.S.C. § 670 (stating that the statute was enacted "[f]or the purpose of enabling each State to provide, in

appropriate cases, foster care and transitional independent living programs *for children*") (emphasis added); *cf. Artist M.,* — U.S. at ——, 112 S.Ct. at 1367 (referring to the "child beneficiaries" of the Adoption Act).

But we need not base our decision on a definitive conclusion that section 675(5)(C) was not intended to benefit the foster parents. For even if it could be so construed, the provision cannot overcome the second hurdle for establishing a federal right enforceable under section 1983 in light of this circuit's recent interpretation of *Artist M.*'s effect on existing precedent on this issue. Under the *Wilder* framework, once the court perceives an intended benefit, the provision still does not create an enforceable right if the statute "reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. *Wilder* held that the Boren Amendment to the Medicaid Act—an Act that, like the AACWA, required each state that sought federal reimbursement for costs to submit a plan describing the state's program—created substantive federal rights enforceable under section 1983. *Id.* at 523, 110 S.Ct. at 2525. Notwithstanding *Wilder*, *Artist M.* seemed to hold that the AACWA provision *does not* create such enforceable rights in part because the requirement it imposes on the states "only goes so far as to ensure that the State have a plan approved by the Secretary which contains the ... listed features." — U.S. at ——, 112 S.Ct. at 1367.[11]

---

9. Although some have argued that *Suter v. Artist M.*, — U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), superseded the well-established approach set out in *Wilder*, as the First Circuit recently noted, "it is much too early to post epitaphs for *Wilder* and its kin." *Stowell v. Ives*, 976 F.2d 65, 68 (1st Cir.1992). The court stated:

> For one thing, *Suter* offered no analytic framework to replace the structure erected in the Court's previous decisions. For another thing, the *Suter* Court, while weakening earlier precedents in certain important respects, was careful not explicitly to overrule them [and indeed] relied on those precedents as pertinent authority.

*Id.* The court thus found it "both prudent and possible to synthesize the teachings of *Suter* with

the Court's prior precedents." *Id.* We proceed under the same assumption.

10. By contrast, though some may dispute whether the provision ultimately operates to advance children's best interests, there is no doubt that Congress *intended* it to do so. *See, e.g.,* 42 U.S.C. § 675(5)(A) (requiring that each child have a case plan "designed to achieve placement in the least restrictive (most family like) setting available ... consistent with the best interest and special needs of the child").

11. The Court acknowledged that the underlying Medicaid legislation in *Wilder* similarly required states to submit a plan describing their Medicaid program, but nonetheless found *Wilder* distinguishable. — U.S. at ——, 112 S.Ct. at 1368.

If *Artist M.*'s effect on *Wilder*'s approach was unclear, this court's broad interpretation of *Artist M.* in the recent case of *Clifton v. Schafer*, 969 F.2d 278 (7th Cir.1992), left little doubt that the Procopios' federal statutory argument is thwarted by *Artist M.'s* modified application of the *Wilder* scheme. *Clifton* held that a federal regulation providing for continuing payment of welfare benefits pending a hearing did not give rise to section 1983 liability because the statutory provision, like that in *Artist M.*, "does not explicitly require continuing reimbursement pending a hearing," but instead "requires only that the state adopt a plan" providing for such requirements. *Id.* at 284.

As the *Clifton* court acknowledged, *Artist M.* also emphasized the vagueness of the AACWA provision at issue in that case; the provision at issue in *Clifton*, on the other hand, was admittedly "not nebulous and variable from case to case." *Id.* Downplaying that aspect of *Artist M.* as merely the Court's way of distinguishing *Wilder*,[12] the *Clifton* court based its holding on *Artist M.'s* understanding of the binding nature of the provisions asserted. Under that approach, the provision at issue in *Clifton* conferred only the right to a plan complying with the requirements, not a right to challenge any deviation from those requirements. Because

the plan itself was concededly legal, the plaintiff had no right enforceable under section 1983. *Id.* at 284–85. For better or for worse, then, under the authority of this circuit, *Artist M.* precludes the Procopios' federal statutory claim.[13]

■ It is somewhat unclear from the Procopios' brief whether they also argue that section 675(5)(C) of the AACWA is itself the source of a liberty interest the deprivation of which requires due process.[14] To the extent the Procopios make such an argument, it necessarily must fail. In a different context, this court has noted the fundamental logical flaw in viewing the process as a substantive end in itself. "If a right to a hearing is a liberty interest, and if due process accords the right to a hearing, then one has interpreted the Fourteenth Amendment to mean that the state may not deprive a person of a hearing without providing him with a hearing. *Reductio ad absurdum.*" *Shango v. Jurich*, 681 F.2d 1091, 1101 (7th Cir.1982). As the Supreme Court has made clear, a liberty interest is a substantive interest and "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); *see also id.* at 250 n. 12, 103 S.Ct. at 1748 n. 12 (further noting that "an expectation of re-

Based largely on the detailed factors the statute and regulations set forth for determining how to calculate rates, the Court concluded that the statute "actually required the States to adopt reasonable and adequate rates." *Id.* (citing *Wilder*, 496 U.S. at 519 n. 17, 110 S.Ct. at 2522 n. 17).

12. Despite the clarity of the requirement at issue in *Clifton* that states hold a hearing before reducing benefits, this court concluded that *Wilder* did not prevent it from holding that such a hearing requirement within a broader federal reimbursement scheme "confers, if anything, only a right to a state plan complying with the regulation." 969 F.2d at 284. *Clifton* characterized the difference between the *Wilder* and *Clifton* litigation as the difference between a suit to enforce the plaintiff's right to a state plan that did not violate federal law (which was allowed in *Wilder*) and a suit to challenge "an isolated violation of a concededly legal plan" (which was prohibited in both *Clifton* and *Artist M.*). *Id.* at 285. *Clifton's* understanding of this Supreme Court precedent therefore precludes us from concluding that section 675(5)(C) confers an enforceable right on the Procopios under section 1983.

13. Although this conclusion makes it unnecessary to address the third prong of the *Wilder* framework, we note tangentially that the interest the Procopios assert is obviously not so "vague and amorphous" that it is "beyond the competence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517.

14. Though the Procopios do not clearly differentiate their contention that they can sue directly under the AACWA through section 1983 from their contention that the AACWA serves as a source for the Procopios' liberty interest, some language in their briefs suggests that they intend to argue both. *See, e.g.,* Appellants' Br. at 4 (stating that "the Procopios' interests also derive from the [AACWA]" and noting that if a timely hearing had been held, they "certainly would have concluded the adoption of Ashley"); *id.* at 27 (noting that section 1983 authorizes "constitutional claims based upon federal entitlements"); Appellants' Reply Br. at 22 (stating that the AACWA "supports the Procopios' claim that due process was violated by the failure to hold a timely dispositional hearing).

ceiving process is not, without more, a liberty interest protected by the Due Process Clause"); *Fleury v. Clayton,* 847 F.2d 1229, 1231 (7th Cir.1988) ("There is neither a 'liberty' nor a 'property' interest in procedures themselves."); *Brandon v. District of Columbia Bd. of Parole,* 823 F.2d 644, 648 (D.C.Cir. 1987) (stating that "the notion that naked process itself takes on constitutional dimensions has most troublesome implications"); *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 58 (2d Cir.1985) (stating that the mere existence of reasonable procedures entitling one to a hearing does not give rise to an independent substantive liberty interest). We likewise conclude that under the circumstances of the case before us, the procedural guarantees embodied in section 675(5)(C) of the AACWA do not give rise to a constitutional liberty interest.

Because we hold that the Procopios have not established that state or federal law creates a liberty interest in Ashley's foster family relationship, we need not consider whether the procedures the state afforded them were constitutionally adequate.

### III.

Although the Procopios' plight is a sympathetic one, their long-term foster relationship with Ashley does not create an interest within the Fourteenth Amendment's protection of liberty, and the federal Adoption Act does not confer on them an enforceable right to a timely hearing under section 1983. For the foregoing reasons, we AFFIRM the ruling of the district court.