**Andrew SLEDD, Jr., Plaintiff,**

v.

**Officer Guy LINDSAY, # 2105, Officer Elroy Baker, # 3242, Officer Ernest Brown, # 5579, Officer Herman Cross, # 15479, and the City of Chicago, Defendants.**

**No. 91 C 1917.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 30, 1994.

Jeffrey H. Haas, G. Flint Taylor, Jr., Erica Lassiter Thompson, People's Law Offices, Chicago, IL, for Andrew Sledd, Jr.

Kelly Raymond Welsh, Gregory J. Wojkowski, David Mitchell Zinder, Justin Paul Erbacci, James Patrick McCarthy, Donald Raymond Zoufal and Patrick J. Rocks, Jr., City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, for Guy Lindsay, Elroy Baker, Ernest Brown, Herman Cross and City of Chicago, Illinois.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is the motion of defendant officers Guy Lindsay ("Lindsay"), Elroy Baker ("Baker"), Ernest Brown ("Brown"), Herman Cross ("Cross") (collectively "defendant officers") for partial summary judgment. For the following reasons, the motion is granted.

### FACTS [1]

On March 30, 1989, defendant officers were law enforcement officers with the Chicago Police Department. On that date, Brown spoke with a confidential informant ("CI") concerning the illegal sales of controlled substances from a townhouse located at 1408 East 55th Street in Chicago ("townhouse"). The CI related to Brown that CI personally purchased narcotics from an individual known to the CI as Jessie Green ("Green"). The CI described Green as a 6'2", slender build, dark complected, black male living at the townhouse.

Brown went to the address which the CI provided to verify whether a townhouse existed at the given location. For further verification, Brown contacted the utilities companies to ascertain the name of the occupant of the townhouse. The investigation revealed that an individual named Green did occupy the townhouse. Brown detailed the CI's information on a request for a search warrant. A judge subsequently signed a search warrant commanding defendant officers to search the townhouse and a black male identified as Green, approximately twenty-two years of age, slender build, and with a dark complexion. On March 31, 1989, between 8:30 p.m. and 9:00 p.m., Brown returned to the townhouse. He parked his vehicle in the

---

1. The following facts are drawn from the statements of undisputed facts submitted by the parties in compliance with Rules 12(M) and (N) of the Rules of the United States District Court for the Northern District of Illinois ("Local Rules"). The court accepts only those statements of facts that satisfy the requirements of the Local Rules.

parking lot located in the rear of the townhouse to conduct surveillance.

On March 31, 1989, plaintiff Andrew Sledd, Jr. ("Sledd"), twenty-four years of age at the time, was living at the townhouse with his brother, Jessie Green, Jr., his mother Yvonne Green ("Y. Green"), and his father Jessie Green, Sr. ("J. Green"). The front entrance of the townhouse faced 55th Street and the back entrance abutted a parking lot. The townhouse had large glass windows in the front and rear. Views from these windows were unobstructed. The rear side of the townhouse also had a large sliding glass door. Sledd's bedroom was located on the second floor in the rear.

Brown observed a black male fitting the description of Green seated inside a room nearest to the rear patio of the townhouse. He also observed other individuals in the room with the black male. During the evening hours of March 31, 1989, Sledd's fiance, Maria Delos Reyes ("Reyes"), was visiting with Sledd and Verleen Ellis ("Ellis") was baby sitting Jesse Green, Jr. Additionally, Sledd's friend, Eric Carson, black male, 6'0" in height, twenty-eight years of age, was also visiting with Sledd until approximately 9:00 p.m. Brown stopped the surveillance and returned to the narcotics division to plan the execution of the search warrant. The discussion centered on the physical description of the townhouse and the scope of the search. Defendant officers were concerned about the large glass windows situated in the front and the back of the townhouse. They did not want to be discovered prior to the execution of the warrant.

At approximately 10:15 p.m., defendant officers and three other Chicago Police officers converged on the townhouse to execute the search warrant. They wore civilian clothes rather than police uniforms. Defendant officers, however, brought their police issued baseball caps with the police emblem on the crown and bullet proof vests with police patches on the chest plates. Defendant officers knew that marks identifying them as police officers served as an announcement to the occupants of the targeted premise that they are not unlawful intruders. Approximately twenty minutes later, Brown noticed a light on the second floor go on and also observed movement inside.

Sledd and Reyes were upstairs on the second floor in Sledd's bedroom. Reyes laid on Sledd's bed watching television while Sledd prepared to go to work that night. Also, the water in the sink and the bathtub was running in the adjoining bathroom. Brown radioed the others and apprised them of the development that a second floor light had come on and that someone was at home. Brown then walked over to join the other defendant officers. Defendant officers put on their bullet proof vests. They also put on police issued baseball caps with the Chicago Police Department insignia as they prepared to execute the warrant. Defendant officers proceeded to the front of the townhouse, and the other three officers covered the rear.

As Sledd was just about to take a shower, defendant officers pounded on the front door of the townhouse. At the time of the pounding, Reyes was still lying on Sledd's bed watching The Tonight Show with Johnny Carson, and Ellis was lying down on a sofa in the living room, which was located on the first floor rear of the townhouse, watching the same program on television.

Defendant officers banged on the front door a number of times while announcing their office and purpose. They knew that entering without announcing their office may cause the occupants to unwittingly use force to defend themselves. Cross heard voices coming from inside the townhouse before and after the knocking. Cross could not distinguish whether the voices were of the occupants or sounds from the television. Defendant officers waited for a response, but none came. Sledd and his neighbors did not hear the announcement of defendant officers.

When defendant officers pounded on the front door, Reyes and Sledd were befuddled by the loud noise. Sledd grabbed a towel, wrapped it around his waist, and started down the stairs to the first floor. He assumed the noise was coming from the front door. Defendant officers continued their knocking because they did not hear any response from the occupants. The voices from the inside continued, but defendant officers

could not determine whether the voices were of the occupants or voices from the television. As Sledd descended the staircase leading to the first floor, he heard additional pounding noises emanating from the front door. Ellis was on the first floor.

As the banging continued, Sledd did not call out to investigate who was at the door. None of the occupants made an inquiry. Not getting a response from inside, defendant officers employed a battering ram to effectuate a forced entry. When Sledd reached half way down the stairs, he saw the front door coming off its hinges. As the door came off the hinges, the door began to crack. Upon seeing this, Sledd ran back upstairs to the second floor. He went directly to his bedroom and retrieved his .22 caliber Marlin rifle.

The front door swung open and defendant officers entered the front interior vestibule of the townhouse. When Ellis observed defendant officers in the vestibule, she realized that they were police officers by looking at their attire, badges, and patches on some of the officers. After gaining entry, Brown, Baker, and Lindsay proceeded up the stairs as they announced their office, "police officers, police officers, we have a search warrant!" (Def.'s 12(M) Stmt. ¶ 60.) Cross remained and secured the first floor.

Once Sledd grabbed his rifle, which was loaded, he turned towards the bedroom door. He thought that someone was breaking into his house. Sledd heard voices coming from the first floor, but was unable to distinguish the words. Reyes crouched down behind the bed. As Sledd turned towards the bedroom door, he was holding his rifle across his body with his left hand on the stock and right hand near the trigger, with the barrel pointing upwards in a forty-five degree angle.

As Sledd approached the bedroom doorway, he saw a black man, now identified as Baker, standing in the doorway facing him, wearing a blue jacket, blue jeans, and white tennis shoes. Baker, according to Sledd, was holding his pistol shoulder level pointing up

towards the ceiling in a ready position. Their eyes met for a split second, then Baker retreated down the hall towards the stairs. As Baker ran, he yelled "he's got a gun, lets get the f—— out of here." Carrying the loaded rifle, Sledd followed Baker down the hall. He did not say anything to Baker or to anyone else in the townhouse.

Brown again announced the office and ordered Sledd to drop the weapon. The view of the second floor hallway was obstructed by a wall adjacent to the staircase. Sledd heard voices coming from the first floor area but did not hear any distinguishable words of a warning or a police announcement. When Sledd reached the top of the stair case, approximately six seconds had elapsed since grabbing the gun. He held the gun still at a forty-five degree angle with his right hand near the trigger. Sledd stepped into the stairway and then turned to face down the staircase. As he turned, the barrel of the rifle turned with him towards defendant officers in the stairway in a downward forty-five degree angle. Defendant officers observed Sledd at the top of the stairway with his rifle turning towards them. The barrel of the rifle was approximately fifteen feet away from Brown when Sledd turned into the stairway. Sledd's movement and his rifle placed defendant officers in fear of their personal safety. As a result, defendant officers discharged their weapons and disabled Sledd.

Sledd turned out of the stairway, took a few steps towards the bedroom door, and collapsed. According to Sledd, after he fell in front of his bedroom door, Baker rolled him over, put his knee on Sledd's chest and his pistol to Sledd's temple, and said "[w]e're the police you ass——. I should blow your f——ing brains out." (Def.'s 12(M) Stmt. ¶ 85.) Sledd then replied "I'm hurt, officer please call an ambulance." *Id.* Further, Sledd claims that Baker then struck him in the head with his pistol, causing a black eye and a bald spot on his head, and then kicked him in the groin.[2]

---

2. Defendant officers' motion for summary judgment as it pertains to count I only challenges the viability of the excessive force claim to the extent it is based on the use of deadly force at the time

Sledd turned into the top of the staircase. Sledd's claim of being hit in the head and being kicked in the groin is not contested in the motion and will remain an issue for trial.

After the shooting, Officer Carl Smith ("Officer Smith") conducted a brief inquiry as to the location of Sledd's room. Officer Smith was one of the three officers who covered the rear of the townhouse during the warrant execution. He is not a named defendant in this case. Pursuant to the answers provided during the inquiry, Officer Smith searched Sledd's bedroom. While searching Sledd's bedroom closet, Officer Smith recovered six clear plastic bags containing a white powder substance, which he suspected was cocaine, from a coat pocket. Defendant Officers summoned medical attention and, upon arrival, the medical personnel took Sledd to Michael Reese Hospital.

The State of Illinois ("State") eventually placed Sledd under arrest and charged him with the offenses of attempted murder, armed violence, aggravated assault, and possession of cocaine and cannabis. At the conclusion of Sledd's bench trial, on September 3, 1991, Circuit Court of Cook County Judge Barbara Disko concluded that the State failed to present sufficient evidence to establish Sledd's guilt beyond a reasonable doubt.[3] While the criminal charges were pending in the state court, Sledd filed a civil complaint in federal court on March 29, 1991. Since the initial filing, Sledd amended his complaint and on May 22, 1992, and he filed his Second Amended Complaint at Law. He alleges a § 1983 claim for the use of excessive force under count I, a § 1983 claim for failure to provide prompt medical care under count II,[4] a § 1983 claim for false arrest, false imprisonment, and malicious prosecution under count III, a § 1983 claim for conspiracy claim under count IV, a state claim for malicious prosecution under count V, a state claim for conspiracy under count VI, and a respondeat superior claim under count VII.[5]

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Transp. Communications Int'l Union v. CSX Transp., Inc.,* 30 F.3d 903, 904 (7th Cir.1994). Summary judgment is not a discretionary remedy and must be granted in the event the plaintiff lacks sufficient evidence. *Jones v. Johnson,* 26 F.3d 727, 728 (7th Cir.1994) (per curiam). Even though all reasonable inferences are drawn in favor of the party opposing the motion, *Associated Milk Producers, Inc. v. Meadow Gold Dairies,* 27 F.3d 268, 270 (7th Cir.1994), presenting only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Walker v. Shansky,* 28 F.3d 666, 671 (7th Cir.1994). Nor will some metaphysical doubt as to the material facts suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

Moreover, the disputed facts must be those that might affect the outcome of the suit to properly preclude summary judgment. *Beck Oil Co. v. Texaco Ref. & Mktg., Inc.,* 25 F.3d 559, 561 (7th Cir.1994). A dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to designate specific

---

**3.** Sledd asserts this fact of being found not-guilty on all criminal charges as a material fact. The court refers to this fact only for purposes of providing a background to the case, but attaches no relevance to Judge Disko's decision on the bench trial. "A verdict of 'not guilty' does not mean that the defendant didn't do it; it means that the prosecution failed to establish culpability beyond a reasonable doubt." *United States v. Smith,* 5 F.3d 259, 262 (7th Cir.1993).

**4.** Sledd has agreed to withdraw count II from his Second Amended Complaint at Law. Hence, count II is no longer an issue in the instant action.

**5.** On September 16, 1994, the court entered an agreed order dismissing Sledd's claims against defendant City of Chicago. Hence, count VII is no longer a contested issue in the instant action.

facts showing a genuine issue for trial. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

■ In the Northern District of Illinois, to properly designate contested facts, the non-moving party must strictly adhere to the requirements of Rule 12(N) of the Rules of the United States District Court for the Northern District of Illinois ("Local Rules").[6] Local Rule 12(N) is designed to ensure that the non-movant does not simply rest on his or her pleadings to avoid summary judgment, especially when the opposing party also bears the burden of proof. *MacDonald v. Commonwealth Edison Servs. Annuity*, 810 F.Supp. 239, 241 (N.D.Ill.1993). Local Rule 12(N) requires the non-movant to file "a concise response to the movant's [Local Rule 12(M)(3)] statement that shall contain ... a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...." Local Rule 12(N)(3)(a).

Any facts asserted by the movant in the 12(M)(3) statement are deemed admitted unless the opposing party contradicts them in the manner specified under Local Rule 12(N)(3)(a). *Knox v. McGinnis*, 998 F.2d 1405, 1408 n. 8 (7th Cir.1993); *see also Lionel Trains, Inc. v. Albano*, 831 F.Supp. 647, 649 (N.D.Ill.1993) (holding that failure to comply with Rule 12(n) results in material facts being admitted). A mere denial of, or disagreement with, the movant's asserted facts is inadequate if made without reference to supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir.1993). The Seventh Circuit has repeatedly upheld the strict application of Local Rule 12(N). *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir.1992) (collecting cases).

■ In response to defendant officers' Rule 12(M)(3) statement, Sledd filed his 12(N)(3)(a) statement with references to alleged supporting materials to those 12(M) statements he disagrees with and denies. The defect in Sledd's 12(N)(3)(a) denial and disagreement responses is that the referenced materials do not support the denials and disagreements. Denials must be supported by specific facts, rather than characterizations and arguments of counsel. *Early v. Bankers Life & Casualty Co.*, 853 F.Supp. 1074, 1079 (N.D.Ill.1994). "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes...." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994). By inundating the court with superfluous and extraneous facts and references to immaterial records, Sledd makes a feeble attempt to create a factual chaos, rather than a genuine issue of material fact, in hopes of surviving a motion for summary judgment. Sledd's purported compliance with Rule 12(N) butchers the purpose behind 12(N) statements:

> [T]hey are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

*Id.* at 923. Therefore, the court accepts defendant officers' 12(M) statements of facts, which Sledd either admits or insufficiently denies, as admitted, and consider only those facts that are both material and properly alleged in Sledd's 12(N)(3)(b) statement as additional facts requiring a denial of the motion.

Having determined which facts are uncontested, the court will now turn its attention to Sledd's claims of constitutional violations.

---

**6.** Prior to April 4, 1994, Local Rules 12(M) and 12(N) were designated as Local Rules 12(m) and 12(n) respectively. The cases cited in this opinion which discuss Local Rules 12(m) and 12(n) are still valid and applicable for the propositions stated herein. The only notable change in the Local Rules 12(M) and 12(N) is that under the amended Local Rule 12(M)(3), the movant is now required to respond to additional facts submitted by the non-movant in accordance with Local Rule 12(N)(3)(a). Otherwise, those additional facts submitted by the non-movant are deemed admitted by the movant.

An examination of the Second Amended Complaint at Law reveals that Sledd's claims may be divided into two categories: federal § 1983 claims and state claims. Further, the state claims are identical in nature to some of the § 1983 claims and arise out of the underlying conduct which is the basis for the federal claims. Therefore, the court will initially focus on the § 1983 claims and return to the state claims if necessary.

■ To maintain a cause of action under § 1983, a plaintiff must present sufficient evidence to establish the following two elements: (1) that the defendants were acting under color of state law, and (2) that their conduct deprived the plaintiffs of rights secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Procopio v. Johnson,* 994 F.2d 325, 328 (7th Cir.1993). Undoubtedly, defendant officers were acting under the color of state law when they entered the townhouse to execute a search warrant. Defendant officers do not contest that they were acting under the color of state law, nor present any contrary evidence. The controversy in the instant action is the constitutionality of the events which took place after the forced entry into the townhouse.

■ But before the court delves into the issue of the constitutionality of defendant officers' conduct, the court must first determine whether they are entitled to qualified immunity. It is a well settled tenet that under the judicially created doctrine of qualified immunity, public officials performing discretionary functions are shielded from civil damages unless their conduct violates a clearly established statutory or constitutional right. *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Bakalis v. Golembeski,* 35 F.3d 318, 321 (7th Cir. 1994); *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994). The thrust behind granting public officials qualified immunity from lawsuits is to protect them "from undue interference with their duties and from potentially disabling threats of liability." *Harlow,* 457 U.S. at 806, 102 S.Ct. at 2731. The

immunity " 'grants ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violated the law.' " *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986)).

■ While qualified immunity is characterized as an affirmative defense to liability, *Sivard v. Pulaski County,* 17 F.3d 185, 189 (7th Cir.1994), it also functions as an immunity from lawsuits so that public officials are spared from having to endure the demands of a litigation. *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Therefore, whenever possible, district courts must resolve the issue of qualified immunity issue first to weed out those claims that are subject to the immunity. *Id.* This approach will protect police officers from having to engage in a costly trial on the merits. *Hunter,* 502 U.S. at ——, 112 S.Ct. at 537.

■ This layer of protection from civil liability is vital to advance public interests and to assure that public officials, such as defendant officers, will carry out the duties of their office and the commands of the courts. On March 31, 1989, a state court commanded defendant officers to search a male black known as Jesse Green, approximately twenty-two years of age, six feet-two inches in height, slender build, dark complexion and the townhouse located at "1408 East 55th Street in Chicago, Cook County, Illinois and seize cocaine, cocaine paraphernalia, proof of residence and any instruments used in the cutting or preparation of cocaine for sale." (Def.'s Exh. L.) In executing this warrant, " 'officials should not err always on the side of caution' because they fear being sued." *Id.* (quoting *Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984)).

■ "The doctrine of qualified immunity shields public officials ... from damages unless their conduct was unreasonable in light of clearly established law." *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994). In de-

828

termining whether the right alleged to have been violated by a governmental official was clearly established, the " 'very action in question' need not have been previously held unlawful, but, in the light of pre-existing law, the unlawfulness of the action must be apparent." *Sivard,* 17 F.3d at 189. The burden of showing that the right allegedly violated was clearly established is on the plaintiff. *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir. 1993). "This requires the plaintiff to offer either a closely analogous case or evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Id.*

▮ A review of the relevant precedent and the uncontested facts establishes that defendant officers. are entitled to qualified immunity from Sledd's § 1983 claims of the use of excessive force, false arrest and false imprisonment. These types of claims against law enforcement officers must be analyzed under the objective reasonableness standard under the Fourth Amendment. *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992). With respect to Sledd's claim of the use of excessive force, the qualified immunity inquiry within the Fourth Amendment context requires the court to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

In conducting this objective reasonableness test, the *Graham* Court offered the following guidance:

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unneces-

sary in the peace of a judge's chambers," *Johnson v. Glick,* 481 F.2d [1028], at 1033 [ (2nd Cir.1973)], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation. *Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1872 (citations omitted).

▮ The law against use of deadly force has been clearly established since the decision in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). If a reasonable officer confronting a situation identical to the one alleged in the lawsuit could have found probable cause to believe that deadly force was necessary to protect the safety of himself and others from a threat of death or serious bodily harm, then qualified immunity must be afforded to the officer. *Plakas v. Drinski,* 19 F.3d 1143, 1146 (7th Cir.1994); *Ellis v. Wynalda,* 999 F.2d 243, 246 (7th Cir.1993). Further, an Illinois statute provides that an officer "is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or bodily harm to himself or such other person...." 720 ILCS 5/7–5 (1992).

▮ Under the prevailing standard for permissible use of deadly force and the totality of the circumstances defendant officers confronted on March 31, 1989, their act of shooting Sledd was reasonable. Defendant officers saw a man, who failed to heed their warnings, holding a rifle with its barrel pointing in their general direction. Immediately prior to shooting, defendant officers knew that they were executing a search warrant in connection with an alleged illegal drug trade occurring at the townhouse. Substantial consideration must be afforded to this fact because guns are universally recognized as tools of the drug trade. *United States v. Banks,* 987 F.2d 463, 468 (7th Cir. 1993); *United States v. Singer,* 943 F.2d 758, 763 (7th Cir.1991); *United States v. Rush,* 890 F.2d 45, 49 (7th Cir.1989); *United States*

*v. Alvarez*, 860 F.2d 801, 829 (7th Cir.1988), *cert. denied*, 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989). "A weapon 'provid[es] the defendant with security and confidence, facilitat[ing] a narcotics transaction.'" *United States v. Wilson*, 938 F.2d 785, 791 (7th Cir.1991) (quoting *United States v. Ocampo*, 890 F.2d 1363, 1371 (7th Cir.1989)) (brackets in original). Further, "[i]t is well established that firearms are used to protect illegal drug traffickers from the dangers presented by law enforcement...." *United States v. Villagrana*, 5 F.3d 1048, 1051 (7th Cir.1993).

Before the entry, defendant officers knew that there were occupants in the townhouse. Yet, when defendant officers announced their office and intention and banged loudly on the front door for several seconds, the occupants failed to respond. After defendant officers entered the townhouse and proceeded to the second floor, Baker discovered that a male occupant had armed himself with a rifle. Baker quickly notified the others as he was running away from Sledd. Brown yelled to announce the office and a warning to drop the weapon. Sledd, however, did not drop the rifle. Rather, he, from defendant officers' view point, ignored the warnings and positioned himself at the top of the staircase with the barrel of the rifle pointing in the general direction of defendant officers. At this moment, defendant officers had probable cause to believe that the male occupant, now known as Sledd, posed an imminent threat of great bodily harm or death to defendant officers carrying out the commands of the search warrant.

These events took place in matter of seconds, rather than minutes or hours, allowing defendant officers little time to decide. "In moments of crisis, men and women in whom we entrust the safety of our persons and property must make split second decisions." *Ellis*, 999 F.2d at 247 (Bauer, J., dissenting). Under these circumstances, defendant officers' use of deadly force to prevent Sledd from harming them was reasonable and, therefore, they are entitled to qualified immunity from count I.

■ Sledd contends that defendant officers are not entitled to qualified immunity in this case because there is a genuine issue of material fact whether officers unreasonably created the situation where deadly force may be applied. In support of this argument, Sledd asserts that issues of whether defendant officers knocked prior to entry, whether they announced their office and their intention, and whether they provided adequate warning to Sledd that they were police officers and that he must drop his rifle remain unresolved and are disputed. From Sledd's perspective, defendant officers' conduct was unreasonable because they neither identified themselves nor gave adequate warning so as to give Sledd an opportunity to comply with defendant officers' order and to put down the rifle.

■ While it is true that an officer may not use deadly force in a situation where the officer himself "unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him," *Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir.1993), the uncontested facts in this case do not support such a scenario. The facts in this case demonstrate that defendant officers pounded on the front door for a response before entry, announced their office and their intention loudly and repeatedly, and yelled warnings to Sledd to drop the weapon when Baker discovered that he was armed. Baker first retreated and shouted a warning to the other officers. Additionally, defendant officers were wearing badges and patches to identify themselves as police officers. In fact, when defendant officers came through the front door, Ellis recognized them as police officers from what they were wearing. Therefore, the facts in this case do not support Sledd's contention that defendant officers unreasonably created a hostile situation where Sledd was not given an opportunity to avoid a deadly confrontation from the view point of defendant officers.

The uncontested facts of this case are inapposite to the facts in *Yates v. City of Cleveland*, 941 F.2d 444 (6th Cir.1991), a case Sledd cites in support of his position. The facts in *Yates* established that the officer involved in the shooting of a civilian proceeded into a poorly lit hallway without "identifying himself as a police officer, was not wear-

ing his hat, and did not use a flashlight or display a billy club." *Id.* at 445. Another notable distinction between *Yates* and this case is that in *Yates,* the court held that the officer's subjective belief that his safety was threatened was not relevant and when objectively viewed, his fear was unreasonable. *Id.* at 447.

In contrast, defendant officers identified themselves while they were banging on the front door and after they entered the townhouse and wore identifying Chicago Police emblems. Moreover, the threat of bodily harm or death that Sledd posed on the night of March 31, 1989, was both imminent and real. Brown yelled to Sledd to drop the weapon, but the warning went unheeded, and instead, Sledd stepped into the narrow staircase with his rifle pointing downwards in the general direction of defendant officers.

■ The flaw in Sledd's premise and, thus, his conclusion, is that he presumes that because the occupants of the townhouse profess not to have heard, defendant officers therefore must have failed to announce their office, their intention, and warnings to Sledd to drop the weapon. This is a non sequitur. Simply because one did not hear the other's voice, even if true, does not warrant the universal conclusion that the other individual did not say anything. Further, "[w]hen reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the non-movant while in qualified immunity context the balance favors the movant." *Ellis,* 999 F.2d at 246 n. 2 (citing *Hunter,* 502 U.S. at ——, 112 S.Ct. at 537). Moreover, there existed no clear standard of law that an officer must obtain confirmation that the threatening suspect knows that he is confronting a peace officer prior to using deadly force. Thus, defendant officers are entitled to qualified immunity from claims arising out of their use of deadly force to incapacitate Sledd under the facts of this case.

■ Defendant officers are also entitled to qualified immunity from claims of false arrest, false imprisonment, and malicious prosecution. The standard the court must apply in the context of qualified immunity is whether a reasonable officer could

have believed that probable cause existed to arrest Sledd. *Hunter,* 502 U.S. at ——, 112 S.Ct. at 537. "Probable cause existed if 'at the moment the arrest was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [Sledd] had violated" the law. *Id.* (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). The standard for determining the existence of probable cause for qualified immunity analysis is less stringent than in the context of a suppression hearing. *Simkunas v. Tardi,* 930 F.2d 1287, 1291 (7th Cir.1991). Further, the existence of probable cause is an absolute bar to a § 1983 claim for false arrest, false imprisonment, and malicious prosecution. *Biddle v. Martin,* 992 F.2d 673, 678 (7th Cir.1993).

The undisputed facts in this case demonstrate that a reasonable officer could have believed that probable cause existed and probable cause did exist to arrest Sledd on charges of not less than aggravated assault and possession of controlled substance. As discussed previously, from the view point of defendant officers, Sledd armed himself with a rifle and confronted defendant officers with the barrel of the rifle pointing in their general direction in a narrow stairway even after Brown announced his office and ordered him to drop the weapon. Additionally, Officer Smith recovered several clear plastic bags containing a white powder substance, suspected cocaine, from a pocket of a coat in Sledd's bedroom closet. This discovery would be adequate for a reasonable officer to believe that probable cause existed to arrest Sledd on a charge of possession of controlled substances.

■ Sledd asserts in opposition that Lindsay deliberately planted the narcotics found in Sledd's bedroom. Certainly, if an officer plants a controlled substance on a suspect and arrests him or her for possession of that substance, a reasonable officer could not believe that probable cause existed to arrest the suspect. However, there is no evidence that Lindsay planted the narcotics in a coat hanging in Sledd's bedroom closet,

that he gave the narcotics to Officer Smith to be used against Sledd, or that Lindsay even possessed the controlled substance prior to the entry into the townhouse. Therefore, defendant officers are entitled to qualified immunity from claims of false arrest, false imprisonment, and malicious prosecution.

·Having concluded that defendant officers are entitled to qualified immunity from the claims arising out of the shooting and the subsequent arrest, imprisonment, and prosecution of Sledd, they are also entitled to immunity from the state claims arising out of these underlying events. Therefore, the only remaining claim for trial on the merits is the claim of excessive force, count I, against defendant Baker for allegedly striking and kicking Sledd after the shooting took place inside the townhouse.

## CONCLUSION

For the foregoing reasons, the motion of defendant officers for partial summary judgment is granted.

IT IS SO ORDERED.